IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO:** |
| v. | : | **DATE FILED:** |
| **ARA APRAHAMIAN** | : | **VIOLATIONS:** |
| | | 15 U.S.C. § 1 (conspiracy to |
| | : | restrain trade – 2 counts) |
| | | 18 U.S.C. § 1001(a)(2) |
| | : | (false statement – 1 count) |

**INDICTMENT**

**COUNT ONE**

**THE GRAND JURY CHARGES THAT:**

At all times relevant to this count:

**BACKGROUND**

1. A generic drug is a medication created to be the same as an existing approved brand name drug in dosage form, safety, strength, route of administration, quality, and performance characteristics. Most generic drugs are known by the name of their active ingredient.

2. The generic version of a drug is less expensive to purchase than its brand name equivalent. For this reason, state laws often require pharmacists to fill prescriptions for a particular drug with its generic rather than its brand name version. Nearly 90% of all prescriptions in the United States are filled with generic drugs.

3. Companies that sell generic drugs may manufacture those drugs in their own facilities or purchase them from others (collectively referred to as "manufacturers").

Manufacturers usually sell their generic drugs to a number of different types of customers, including wholesalers, distributors, retail drug stores, drug store chains, and group purchasing organizations.

4. Manufacturers of generic drugs are required by federal regulation to identify a price known as the "Wholesale Acquisition Cost," or "WAC," for each drug they sell. The WAC is defined as the manufacturer's list price to wholesalers or direct purchasers for the most recent month for which information is available. It does not represent actual transaction prices and does not include discounts or rebates. Manufacturers generally announce a new WAC by notifying their customers in writing. Such announcements are typically reported promptly in one or more commercial publications that are available to both customers and manufacturers in the pharmaceutical industry.

5. Customers often enter into contracts with manufacturers for the purchase of generic drugs. The scope of these contracts varies from as few as one drug to as many as all the drugs a specific customer may buy from a specific manufacturer. The duration of these contracts also varies and may last for as long as a year or more. Customers typically enter into contracts with multiple manufacturers.

6. Customers often award contracts for particular generic drugs to manufacturers through a competitive bidding process. The bidding process may be limited to a particular drug or it may include multiple drugs. After receiving and evaluating the bids, customers generally award the contract at issue to the manufacturer offering the lowest price for each drug that they may need during the term of the contract. The contract may give the manufacturer the exclusive right to supply that drug or may designate the winning manufacturer as the "preferred" provider or "supplier."

7. The contracts between customers and manufacturers of generic drugs set out numerous terms and conditions of sale. These terms include the price per unit that the manufacturer will charge, which is sometimes referred to as the contract price or the invoice price, and any discounts from that price, which include administrative fees, restocking fees, prompt payment discounts, and volume incentive rebates. The net price per unit, after all discounts are accounted for, is sometimes referred to in the generic drug industry as the "dead net" price.

8. Some manufacturers group the different types of customers into "classes of trade" and, in general, charge customers in one class of trade a different price from customers in another class of trade. There is no regulation that requires manufacturers to disclose or report the contract, invoice, or dead net prices they charge any particular customer or group of customers, and there is no public or commercial publication that regularly reports this data. As a result, neither a customer seeking to determine what another customer is paying for a particular drug, nor a manufacturer seeking to determine what another manufacturer is charging for a particular drug, can obtain that information from public or commercial sources.

9. A manufacturer regularly seeks to add to the number of generic drugs it offers to sell. It may do so by, among other things, introducing a new strength of an existing generic drug, introducing an existing generic drug in a new package or formulation, developing or obtaining the right to sell an existing generic drug that it had not previously sold, or reintroducing a generic drug that it had previously stopped selling. The addition of a generic drug to a manufacturer's offerings is commonly referred to in the pharmaceutical industry as a "launch."

**THE DEFENDANT AND HIS CO-CONSPIRATORS**

10.     Defendant ARA APRAHAMIAN, a resident of New York, was the Vice President of Rx Marketing from in or around March 2013 until in or around April 2014, and the Vice President of Sales and Marketing from in or around April 2014 until at least in or around June 2015, at Company A. He was responsible for overseeing generic drug sales, pricing, and contracts at Company A.

11.     Company A, a corporation known to the grand jury, had its principal place of business in New York. Company A, directly or through related entities, was engaged in the manufacturing of generic drugs, and the marketing and sale of generic drugs in the United States.

12.     Company B, a corporation known to the grand jury, had its principal place of business in New Jersey. Company B, directly or through related entities, was engaged in the manufacturing of generic drugs, and the marketing and sale of generic drugs in the United States.

13.     Cooperating witness 1 ("CW-1"), an individual known to the grand jury, was employed at Company B as a sales representative.

14.     Cooperating witness 2 ("CW-2"), an individual known to the grand jury, was employed at Company B as a pricing and contracts executive, and reported directly to CW-3.

15.     Cooperating witness 3 ("CW-3"), an individual known to the grand jury, was employed at Company B as a senior pricing and contracts executive.

16.     Defendant ARA APRAHAMIAN, acting on behalf of Company A, and CW-1, CW-2, and CW-3, acting on behalf of Company B, were competitors in the marketing and sale of generic drugs in the United States.

17. Various entities and individuals, not made defendants in this count, participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance thereof.

18. Whenever in this count reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, employees, agents, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

## DESCRIPTION OF THE OFFENSE

19. From at least as early as March 2013 and continuing until at least June 2015, the exact dates being unknown to the grand jury, in the Eastern District of Pennsylvania and elsewhere, defendant

## ARA APRAHAMIAN

and his co-conspirators, known and unknown to the grand jury, including Company A, Company B, CW-1, CW-2, and CW-3, knowingly entered into and engaged in a conspiracy to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States. The conspiracy engaged in by the defendant and his co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

## MEANS AND METHODS

For the purpose of forming and carrying out the charged conspiracy:

20. Defendant ARA APRAHAMIAN and his co-conspirators did those things that they conspired to do, including, among other things:

(a) discussed the allocation of and agreed to allocate customers located in the United States;

(b) provided and received specific non-public prices paid by allocated customers to the existing supplier;

(c) communicated about the timing of anticipated price increases;

(d) discussed and agreed to increase prices for generic drugs;

(e) provided and received specific non-public prices in connection with agreed-upon price increases;

(f) implemented price increases in accordance with the agreement reached;

(g) submitted bids and offers to, and declined requests to submit bids and offers from, customers in accordance with the agreement reached, including at least one customer located in the Eastern District of Pennsylvania; and

(h) sold and accepted payment for generic drugs at collusive and noncompetitive prices.

21. For example, with respect to certain generic drugs, when Company A or Company B was preparing to launch a generic drug into the other company's market, defendant ARA APRAHAMIAN and CW-1 discussed what share of the market the launching company wanted to obtain. They also discussed customers the launching company might solicit and customers the current supplier was willing to relinquish. During those conversations, or shortly thereafter, defendant APRAHAMIAN and his co-conspirators reached an agreement on which customers the launching company would solicit. The purpose of the conversations between

defendant APRAHAMIAN and CW-1 was to allow the launching company to obtain customers quickly at the highest price possible, and minimize the decline of price for drugs being launched.

22.     During some of the conversations between defendant ARA APRAHAMIAN and CW-1, when the drug being discussed was one being launched by Company B, defendant APRAHAMIAN gave CW-1 Company A's dead net price(s) for certain customers. CW-1 usually made contemporaneous notes of CW-1's conversations with defendant APRAHAMIAN and then promptly reported the results of CW-1's conversation to CW-3 and/or CW-2 at Company B, including the specific prices defendant APRAHAMIAN disclosed. Company B used the pricing information CW-1 obtained from defendant APRAHAMIAN to solicit the agreed-upon customers that CW-1 discussed with defendant APRAHAMIAN. Defendant APRAHAMIAN then authorized Company A to relinquish those customers to Company B by declining to submit a competing bid. As a result, Company B was usually successful in obtaining those customers.

23.     The conversations about launches occurred with respect to the following generic drugs, among others: clotrimazole cream; desonide ointment; fluocinonide ointment; lidocaine ointment; nystatin triamcinolone cream; and nystatin triamcinolone ointment. Each of these products is used to treat skin conditions.

24.     For example, in or around January 2014, defendant ARA APRAHAMIAN discussed Company B's impending launch of desonide ointment with CW-1. Defendant APRAHAMIAN gave CW-1 Company A's dead net prices for desonide ointment for five customers. CW-1 made contemporaneous notes of the prices CW-1 received from defendant APRAHAMIAN, and CW-1 relayed the substance of their conversation to one or more co-conspirators at Company B. Shortly thereafter, CW-2 directed other Company B employees to

7

send offers to three customers defendant APRAHAMIAN had agreed to relinquish to Company B and for which defendant APRAHAMIAN had given CW-1 Company A's current dead net pricing. Before the discussions between defendant APRAHAMIAN and CW-1, none of those three customers had been identified as target customers by Company B employees responsible for the desonide ointment launch. After each of those three customers notified Company A that it had received a competitive offer, defendant APRAHAMIAN authorized Company A to decline to bid or compete to retain those customers.

25.  On other occasions, defendant APRAHAMIAN and co-conspirators at Company B discussed and agreed to increase prices on certain generic drugs generally in the following manner: When Company A was planning to raise its prices or had recently done so, defendant ARA APRAHAMIAN and CW-1 discussed the amount of the increase, and defendant APRAHAMIAN encouraged Company B also to raise its prices. Defendant APRAHAMIAN also asked that Company B not compete for Company A's customers, particularly during the period before Company B raised its prices. On occasion, defendant APRAHAMIAN provided CW-1 with Company A's non-public prices for various classes of trade. CW-1 usually made contemporaneous notes of CW-1's conversations with defendant APRAHAMIAN about price increases. CW-1 promptly reported the substance of CW-1's conversations to CW-3 and/or CW-2, including any specific prices provided by defendant APRAHAMIAN. After the discussions, Company B usually followed Company A's price increase and, during the period before it did so, declined requests for bids from Company A's customers. The purpose of the communications between and among defendant APRAHAMIAN and co-conspirators at Company B was to ensure that the new, higher prices were implemented and maintained, as much as possible, at the

level discussed, and to limit the ability of Company A's and Company B's customers to switch suppliers.

26. The conversations about price increases occurred with respect to the following generic drugs, among others: carbamazepine extended release tablets, a medication used to prevent and control seizures; multiple formulations of clobetasol, a medication used to treat skin conditions; and fluocinonide gel and fluocinonide ointment, products used to treat skin conditions.

27. For example, beginning in or around May 2014, defendant ARA APRAHAMIAN spoke with CW-1 about a price increase for multiple formulations and sizes of clobetasol, as well as price increases for two other drugs. For many of the formulations and sizes of clobetasol, Company A's proposed WAC price increase was in excess of 1000%. Defendant APRAHAMIAN gave to CW-1, and CW-1 contemporaneously recorded, more than seventy of Company A's new dead net prices for various formulations of those three drugs, by class of trade. CW-1 relayed the substance of CW-1's conversations with defendant APRAHAMIAN to CW-3 and CW-2, and at CW-3's request, CW-1 later confirmed with defendant APRAHAMIAN that the prices CW-1 had recorded were accurate. CW-3 then used the exact clobetasol prices defendant APRAHAMIAN provided to CW-1 to obtain internal approval to increase Company B's clobetasol prices and to set Company B's new price levels for clobetasol at or around the same price levels as Company A. In addition, CW-3 instructed Company B employees not to compete for Company A's clobetasol customers.

28. On numerous occasions, defendant ARA APRAHAMIAN and CW-1 spoke about specific bids and customers. For example, in or around February 2015, defendant APRAHAMIAN spoke with CW-1 about an upcoming bid for a national contract to supply

9

clobetasol to the United States Department of Veterans Affairs. During at least one of their conversations, defendant APRAHAMIAN asked that Company B not compete for the contract and revealed the pricing levels that Company A intended to bid. CW-1 then sent an email reporting the information about Company A's likely pricing levels to CW-3 and others at Company B.

29. Company A and Company B continued to receive and accept payments, including from within the Eastern District of Pennsylvania, for generic drugs affected by the conduct described in this count at collusive and noncompetitive prices through at least in or around June 2015.

### TRADE AND COMMERCE

30. During the period covered by this count, Company A and Company B sold substantial quantities of generic drugs affected by the conspiracy charged in this count to customers located in various states in the United States. In addition, payments from affected customers that purchased drugs sold by Company A and Company B traveled in interstate trade and commerce.

31. During the period covered by this count, the activities of defendant ARA APRAHAMIAN and his co-conspirators with respect to the sale of affected generic drugs were within the flow of, and substantially affected, interstate trade and commerce.

All in violation of Title 15, United States Code, Section 1.

## COUNT TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times relevant to this count:

32. Paragraphs 1-11 and 17-18 of Count One are repeated, realleged, and incorporated in Count Two as if fully set forth in this Count.

### DEFENDANT APRAHAMIAN'S CO-CONSPIRATORS

33. Company C, a corporation known to the grand jury, had its principal place of business in Montgomery County, Pennsylvania, within the Eastern District of Pennsylvania. Company C, directly or through related entities, was engaged in the manufacturing of generic drugs, and the marketing and sale of generic drugs in the United States.

34. Cooperating witness 4, ("CW-4"), an individual known to the grand jury, was employed at Company C, first as a pricing executive and later as a sales executive.

35. Defendant ARA APRAHAMIAN, acting on behalf of Company A, and CW-4, acting on behalf of Company C, were competitors in the marketing and sale of generic drugs in the United States.

### DESCRIPTION OF THE OFFENSE

36. From at least as early as May 2013 and continuing until at least December 2015, the exact dates being unknown to the grand jury, in the Eastern District of Pennsylvania and elsewhere, defendant

**ARA APRAHAMIAN**

and his co-conspirators, known and unknown to the grand jury, including Company A, Company C, and CW-4, knowingly entered into and engaged in a conspiracy to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix

11

prices of, generic drugs sold in the United States. The conspiracy engaged in by defendant APRAHAMIAN and his co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

## MEANS AND METHODS

For the purpose of forming and carrying out the charged conspiracy:

37. Defendant ARA APRAHAMIAN and his co-conspirators did those things that they conspired to do, including, among other things:

   (a) discussed and agreed to increase prices for generic drugs;

   (b) communicated about the timing of anticipated price increases;

   (c) provided and received specific non-public prices in connection with agreed-upon price increases;

   (d) negotiated the amount of agreed-upon price increases;

   (e) implemented price increases in accordance with the agreement reached;

   (f) declined requests to submit bids and offers from customers in accordance with the agreement reached; and

   (g) sold and accepted payment for generic drugs at collusive and noncompetitive prices.

38. On numerous occasions, defendant ARA APRAHAMIAN and co-conspirators at Company C discussed and agreed to increase prices on certain generic drugs generally in the following manner: Defendant APRAHAMIAN and CW-4 discussed the amount of a potential price increase and encouraged the other to follow. If Company A was leading the price increase, defendant APRAHAMIAN provided CW-4 with some of Company A's new,

non-public prices, and if Company C was leading the price increase, CW-4 provided defendant APRAHAMIAN with some of Company C's new, non-public prices. Defendant APRAHAMIAN and CW-4 then used these non-public prices to implement price increases at Company A and Company C. The purpose of the communications between defendant APRAHAMIAN and CW-4 was to ensure that the new, higher prices were implemented and maintained, as much as possible, at the level discussed, and to limit the ability of Company A's and Company C's customers to switch suppliers.

39. The conversations about price increases occurred with respect to the following generic drugs, among others: carbamazepine tabs and chews, medications used to prevent and control seizures and treat bipolar disorder; clotrimazole topical solution 1%, a medication used to treat a variety of skin conditions; etodolac immediate release ("IR") and extended release ("ER") tablets, medications used to treat pain and arthritis; fluocinonide cream, emollient cream, gel, and ointment, medications used to treat skin conditions; and warfarin, a medication used to treat and prevent blood clots.

40. For example, in or around July and August 2013, defendant ARA APRAHAMIAN and CW-4 discussed and agreed to increase prices for etodolac ER. Company A and Company C were the only two suppliers of etodolac ER at this time. During numerous calls, defendant APRAHAMIAN and CW-4 identified and discussed specific non-public prices for etodolac ER, and agreed to specific new, higher WAC and other prices for three sizes of etodolac ER. Approximately six days before either Company A or Company C announced a price increase for etodolac ER to their customers or commercial publications, defendant APRAHAMIAN and CW-4 each circulated spreadsheets within their respective companies containing the specific agreed-upon proposed WAC and other prices for etodolac ER. After

being told by CW-4 that Company C was going to implement the agreed-upon etodolac ER price increase on or about August 9, 2013, defendant APRAHAMIAN ensured that Company A implemented its etodolac ER increase on the same date.

41. Company A and Company C continued to receive and accept payments, including from within the Eastern District of Pennsylvania, for certain generic drugs at collusive and noncompetitive prices through in or around at least December 2015.

**TRADE AND COMMERCE**

42. During the period covered by this count, Company A and Company C sold substantial quantities of generic drugs affected by the conspiracy charged in this count to customers located in various states in the United States. In addition, payments from affected customers for drugs sold by Company A and Company C traveled in interstate trade and commerce.

43. During the period covered by this count, the activities of defendant ARA APRAHAMIAN and his co-conspirators with respect to the sale of affected generic drugs were within the flow of, and substantially affected, interstate trade and commerce.

All in violation of Title 15, United States Code, Section 1.

## COUNT THREE

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times relevant to this count:

44. Paragraphs 1-13, 16, and 21-24 of Count One are repeated, realleged, and incorporated in Count Three as if fully set forth in this Count.

45. On numerous occasions between 2013 and 2015, defendant ARA APRAHAMIAN and CW-1 discussed, provided, and received non-public prices for generic drugs in advance of launches by Company A or Company B.

46. On September 8, 2016, defendant

### ARA APRAHAMIAN

unlawfully, willfully, and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, made materially false, fictitious, and fraudulent statements and representations, to wit, in connection with an investigation being conducted in the Eastern District of Pennsylvania, defendant APRAHAMIAN was interviewed by an agent of the Federal Bureau of Investigation during a search of the premises of Company A and falsely stated that he never had a conversation with a competitor about the pricing of a product before that product was launched.

In violation of Title 18, United States Code, Section 1001(a)(2).

**A TRUE BILL:**

_____
**GRAND JURY FOREPERSON**

MAKAN DELRAHIM
Assistant Attorney General

RICHARD A. POWERS
Deputy Assistant Attorney General

MARVIN N. PRICE, JR.
Director of Criminal Enforcement

RYAN DANKS
Chief, Washington Criminal I

Antitrust Division
United States Department of Justice

EMMA M. BURNHAM
KEVIN B. HART
Assistant Chiefs, Washington Criminal I

WILLIAM M. MCSWAIN
United States Attorney for the
Eastern District of Pennsylvania

REBECCA MEIKLEJOHN
KRISTINA SRICA
LAUREN M. ELFNER
JOHN W. ELIAS
Trial Attorneys

Antitrust Division
United States Department of Justice